Judge McMahon

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

08 CV 3888

**DOCKET NO.**

**CLASS ACTION**

LOLA B. THORPE, individually and on behalf of
all others similarly situated,

    Plaintiff,

vs.

ZIMMER, INC.; ZIMMER HOLDINGS, INC.;
and ZIMMER US, INC.,

    Defendants.

**COMPLAINT FOR (1) VIOLATION
OF NEW YORK STATE GENERAL
BUSINESS LAW § 349 AND
(2) UNJUST ENRICHMENT**

**DEMAND FOR JURY TRIAL**

RECEIVED
APR 2 4
U.S.D.C. S.D.N.Y.
CASHIERS

   Plaintiff, by and through her undersigned attorneys, and on behalf of herself and all other

similarly situated individuals who are or at the relevant time were residents of the State of

New York, brings this action and alleges the following on information and belief, except as to

those allegations applicable specifically to the named Plaintiff, which are based on personal

knowledge:

## NATURE OF THE ACTION

   1.  This action arises out of a pervasive kickback scheme orchestrated by several of

the largest manufacturers of artificial hip and knee replacement devices.  Each of the companies

has used phony consulting agreements with orthopedic surgeons and other financial inducements

as disguised kickbacks for choosing a particular manufacturer's device to use during a patient's

hip or knee surgery.  Rather than promote safety and effectiveness, the choice of medical device

is thereby governed by the financial gain for participating doctors or hospitals, and yields

increased market share for the companies and their co-conspirators.

   2.  One of these companies is Zimmer, Inc., a subsidiary of Zimmer Holdings, Inc.

By its own reckoning, Zimmer is the world's top seller of both knee and hip implant devices and

related products, accounting for more than a quarter of worldwide sales in each of these markets. A federal investigation has uncovered incriminating evidence that Zimmer, along with the other big four manufacturers of hip and knee implants, violated federal anti-kickback laws during the years 2002 through 2006.  As a result, the U.S. Department of Justice has entered into a Deferred Prosecution Agreement with Zimmer, Inc.  A copy of Zimmer's Deferred Prosecution Agreement is attached hereto as Exhibit A.

3.      The primary concern of federal officials involved with the investigation into the practices of Zimmer and the other four big hip and knee implant manufacturers has been the impact on federally funded health care programs – particularly Medicare, which covers approximately two thirds of all hip and knee replacement surgeries in the United States. However, the damage is not limited to public payers.  By artificially boosting demand for specific companies' hip and knee implant products, and thereby inflating product prices, the illicit practices also harm patients who pay out of pocket for a portion of Medicare-covered hip or knee surgeries, along with private patients who pay higher co-pays and/or other out-of-pocket charges.

## PARTIES, JURISDICTION, AND VENUE

4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332, in that Plaintiff is a citizen of a State that is different from the States where Defendants are incorporated and have their principal places of business, and the amount in controversy exceeds the jurisdictional minimum for diversity jurisdiction.

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district.  Furthermore, Plaintiff has at all relevant times resided in this judicial district, and Defendants at all relevant times have done and continue to do business in this judicial district.

6.      Plaintiff **Lola B. Thorpe** ("Plaintiff") a natural person who is, and at all times relevant to this action was, a resident of the State of New York.

7.      Defendant **Zimmer, Inc.**, a subsidiary of Defendant Zimmer Holdings, Inc., is incorporated under Delaware law and has its principal place of business in Indiana.

8.    Defendant **Zimmer Holdings, Inc.**, the parent company of Defendant Zimmer, Inc., is incorporated under Delaware law and has its principal place of business in Indiana.

9.    Defendant **Zimmer US, Inc.**, a manufacturer of orthopedic implants, is a subsidiary of Defendant Zimmer Holdings, Inc.  Zimmer US, Inc., is incorporated under Delaware law and has its principal place of business in Texas.

10.    The defendants identified in the preceding paragraphs, and any of them together, are referred to collectively herein as "**Zimmer**" or "Defendants."

11.    At all relevant times, Defendants, and each of them, each transacted, solicited, and conducted business within the State of New York and derived substantial revenue from such business.

12.    At all relevant times, Defendants, and each of them, expected or should have expected that their acts would have consequences within the United States of America, and within the Southern District of New York in particular.

**C.**    **Unnamed Co-Conspirators**

13.    At all relevant times, other individuals and/or other entities willingly conspired with Defendants in their unlawful restraint of trade, kickback scheme, and/or other unlawful conduct.  All averments herein against named Defendants are also averred against these unnamed co-conspirators as though set forth at length.

**D.**    **Agents**

14.    At all relevant times, Defendants, and each of them, in performing the acts alleged in this complaint, were acting as the agents, employees, and/or representatives of each other, and were acting within the full course and scope of their agency and employment with the full knowledge, consent, permission, authorization, and ratification, either express or implied, of each of the other Defendants.

15.    Each of the Defendants has participated as members of the conspiracy, and has acted with or in furtherance of said conspiracy, or aided or assisted in carrying out the purposes of the conspiracy, and has performed acts and made statements in furtherance of the conspiracy and other violations of New York law.  Each of the Defendants acted both individually and in

alignment with other Defendants, with full knowledge of their respective wrongful conduct.  As such, the Defendants conspired together, building on each other's wrongdoing, to accomplish the acts outlined in this complaint.  Defendants are sued individually as principals, participants, and aiders and abettors in the wrongful conduct complained of; the liability of each arises from the fact that each has engaged in all or part of the improper acts, plans, schemes, conspiracies, or transactions complained of herein.

## TRADE AND COMMERCE

16.     Throughout the Class period, there was a continuous flow of commerce between **Zimmer** and its co-conspirators, into and out of New York, in the hip and knee implant devices produced by **Zimmer**, and in payments and other forms of consideration provided by **Zimmer** to its co-conspirators.  Defendants' unlawful activities, as described herein, took place within the flow of commerce into and out of New York and among the other states, and had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce in the United States.

## FACTUAL ALLEGATIONS

A.      **Zimmer, Which Touts Itself as the "#1" Seller of Hip and Knee Implant Products in the World, and Just Four Other Companies Together "Control" the Highly Lucrative Market in Hip and Knee Implants**

17.     The market for hip and knee implant products is huge, highly lucrative, and tightly concentrated.  In the United States, the federal Department of Health and Human Services ("HHS") reports that more than 700,000 hip and knee replacement surgeries are performed every year.  HHS's Assistant Inspector General for Legal Affairs, Gregory E. Demske, recently testified to the U.S. Senate Special Committee on Aging that sales of orthopedic devices for hips and knees exceeded $5.1 billion in 2005 in the United States.  (He also testified that global sales of the same products that year topped $9.4 billion.)

18.     In late September 2007, the U.S. Attorney for the District of New Jersey, Christopher J. Christie, reported that just five companies – **Zimmer, Inc.**, among them – control almost 95 percent of sales in the market for hip and knee surgical implants.

19.     **Zimmer** is the self-acknowledged leader of the pack.  **Zimmer**'s 2007 Annual Report displays tables indicating that **Zimmer** has "Market Position #1" in both hip and knee implants.  The same tables indicate that, in 2007, **Zimmer** accounted for 26% of worldwide sales in hip implant products, at $5.0 billion, and 28% of worldwide sales in knee implant products, at $5.8 billion.  **Zimmer** also reported that these sales figures reflected one million patients per year implanted with **Zimmer** hip or knee products.  Nearly 55% of **Zimmer**'s worldwide sales were made in the United States.

**B.**     **A Federal Investigation Has Found That Zimmer, Like the Other Four Companies, Maintained Its Overwhelming Market Dominance Through a "Pervasive" and Anti-competitive Scheme of Kickbacks to Hip and Knee Surgeons, in Violation of Federal and New York Law**

20.     Another measure of **Zimmer**'s market dominance, as well as the seriousness of its wrongdoing, may by found in the size of the fine that **Zimmer** recently agreed to pay to the federal government to avoid (1) prosecution for its participation in a widespread kickback scheme with orthopedic surgeons and (2) potential loss of access to the huge market for government-covered hip and knee implant surgeries.

21.     In a five-page press release issued on September 27, 2007 – entitled "Five Companies in Hip and Knee Replacement Industry Avoid Prosecution by Agreeing to Compliance Rules and Monitoring" – U.S. Attorney Christie announced that the U.S. Department of Justice had settled criminal complaints, and HHS had settled civil claims, against four of the five largest hip/knee implant companies, **Zimmer** among them, for multimillion-dollar fines plus 18-month compliance and monitoring agreements.  Of the total of $311 million in fines that the companies agreed to pay, **Zimmer** paid by far the largest fine:  $169.5 million. This figure dwarfed the next largest fine, $84.7 million assessed against competitor Depuy Orthopaedics, as well as the fines of $28.9 million and $26.9 million incurred by competitors Smith & Nephew and Biomet Orthopedics, respectively.

22.     The government claims arose out of a multi-agency federal investigation that confirmed the existence, during the years 2002 through 2006, of a massive pattern of "financial inducements paid to surgeons to use their products" in hip and knee implant surgeries, in

violation of several federal anti-kickback and false claim statutes.  (As explained in the press release, claims were held in abeyance against one of the five companies, Stryker, only because it was the first of the five companies to cooperate with federal investigators.)  (See Exhibit A attached hereto, **Zimmer**'s Deferred Prosecution Agreement.)

23.     As Mr. Demske of HHS summarized the findings of the federal investigation to the Senate Special Committee on Aging, although some of the companies' payments to surgeons were legitimate,

in certain consulting arrangements the companies **derived little value beyond the acquisition of increased sales of artificial hip and knee implants** used by the consulting surgeons.  The companies also failed to oversee and audit the work performed by the surgeons under the consulting agreements.  For example, the surgeons engaged in "work" activities that involved minimal or no actual work being performed, but created a billable event for the consultant, such as the following:

- Consulting agreements required the physicians to report periodically the services that they provided to the company to support the consulting fees.  Some consulting agreements had only vague requirements for these reports.  When the consulting agreements did include specific requirements, these reports often failed to include the required information or were drafted by sales representatives rather than by the consultants.

- In addition to reports documenting services provided, some companies paid consultants a fee, typically $5,000, for each quarterly report that included information on market trends, activity in the operating room, and product issues.  However, these work reports typically included only cursory descriptions and were often duplicated from quarter to quarter.  Many of these quarterly reports were of little or no value to the companies.

- The companies sponsored consultant panel meetings at resort locations and reimbursed the physicians for travel expenses.  These meetings would only be held for a few hours each day and physician consultants who presented at these meetings typically spoke for a minimal time period, sometimes for as few as 10 minutes.  Although the remainder of the day was available for recreational activities paid for by the company, the consultants were compensated $5,000 for a full day of work.

- Consultants billed for training sessions that involved sales representatives observing the surgeon while in the operating room.  Some of these training sessions were held for experienced sales representatives who, as part of their jobs, had been servicing the surgeons in their sales regions for some time.  These sales representatives were already required to be present in the operating room with the surgeons to assist them with the procedures.  These training sessions lasted for 1 to 2 hours, but the consultants billed

for an 8- to 10-hour workday.

- Some companies entered into product development agreements with consultant physicians, offering them royalty payments once the products were launched. These agreements provided for annual payments of hundreds of thousands or millions of dollars for up to 20 years. The design teams included up to 20 physicians, some of whom were added after the projects were more than halfway completed. The companies often did not measure the contributions of individual physicians and up to half the members of some teams appeared to have performed little or no work.

(Emphasis added.) Mr. Demske also advised the Senate panel that from 2002 through 2006, four of the companies, including **Zimmer**, had "paid physician consultants over $800 million under the terms of roughly 6,500 consulting agreements."

24.    If they failed to receive the benefits that the contracts supposedly were designed to produce, what was really in it for **Zimmer** and the other companies?  Surgeon loyalty, and pumped-up sales of their products.  The federal charges (now deferred, pursuant to the settlement agreements) assert that this was the companies' intent:  that each company's "consulting agreements with certain orthopedic surgeons [were] designed, in part, to induce the surgeons to use, and cause the purchase of, [the company]'s hip and knee reconstruction and replacement products."  And the Department of Justice press release declared that the improper practices had been effective, from the companies' point of view:  "'[p]rior to our investigation, many orthopedic surgeons in this country made decisions predicated on how much money they could make – choosing which device to implant by going to the highest bidder.'"  The press release added that instead of deciding which products to implant "'based on what is in the best interest of their patients,'" too many surgeons had instead been induced to choose implant products based on "'the best interests of their bank accounts.'"

25.    Several sources referred to in Mr. Demske's testimony corroborate the Department of Justice's assertion that such agreements were effective in producing the unlawful result that the participating company desired.  Referring to articles published in the *Journal of the American Medical Association* and the *New England Journal of Medicine*, Mr. Demske testified that researchers "have found that . . . financial industry-physician relationships are pervasive and that the impulse to reciprocate for even small gifts has a powerful influence on behavior."  One

7

of the sources he cited, a 1994 study of full-time attending physicians in a university hospital and their interactions with drug companies, found along several dimensions that "[r]equests by physicians that drugs be added to a hospital formulary were strongly and specifically associated with the physicians' interactions with the companies manufacturing the drugs." As Mr. Demske indicated, there is no reason to confine the implications of this study to the arena of physicians' or surgeons' interactions with pharmaceutical companies.

26.     Two measures reflect how "pervasive" the collusive practices have been between the five companies, including **Zimmer**, and certain surgeons, and how important they have been to the companies' dominance in the hip/knee implant market.  First, as mentioned above, **Zimmer** and three other companies have paid a total of $311 million to the federal government in partial settlement of the government claims.  But second, after this news was made public, the share price in the four companies' stock reportedly rose – signaling investors' perception that the companies had gotten off lightly relative to the vast financial benefits that they continue to reap.

27.     Besides the settlement payments, all five companies, including **Zimmer**, agreed to "prominently feature" on their websites public disclosures of the amounts they pay to surgeons on a periodic basis.  The disclosures now accessible (with some effort) on **Zimmer**'s website confirm that **Zimmer** paid many millions of dollars of direct and in-kind payments to orthopedic surgeons throughout the United States, including New York, during 2007 alone – by which time **Zimmer** was presumably making greater efforts to comply with legal requirements.

**C.     Zimmer's Unlawful Scheme to Restrain Competition in Hip and Knee Surgery Products Has Inflated the Price of Hip and Knee Implants, Resulting in Financial Injury Not Only to Publicly Funded Medical Care Programs But Also to Plaintiff and Other Patients Who Pay for All or a Portion of Their Hip or Knee Implants**

28.     The practices summarized above have sustained an oligopolistic market that Mr. Demske accurately characterized as "controlled" by just a handful of manufacturers, **Zimmer** among them.  This market structure inherently inflates the prices of the hip and knee implant products sold by the big five.

29.     The actions taken by federal officials reflect their concern that such inflated pricing creates a huge and illegal drain on publicly funded health care programs, like Medicare

(which, as the federal officials reported, covers approximately two-thirds of all hip and knee replacement surgeries in the United States).  But individual patients are also harmed by **Zimmer**'s practices, insofar as they pay for all or a portion of their surgeries.

30.      Private-pay patients – including both uninsured persons and persons with private health insurance coverage where their co-pay is a percentage of the overall charge, as well as patients with Medicare coverage who personally pay for a portion of covered procedures (like Plaintiff) – are harmed financially by virtue of higher co-pays and/or other out-of-pocket expenses.  In addition, over time an increment of rising health insurance premiums has been attributable to the general impact of **Zimmer**'s improper, collusive, anti-competitive practices in contributing to the overall rise in health care costs.  The settlements reached by federal prosecutors, and their Deferred Prosecution Agreement with **Zimmer**, being confined to federally funded health care programs, do nothing to remedy these personal financial harms to consumers.

31.      Thus, Plaintiff is compelled to bring this action, on behalf of herself and other similarly situated New Yorkers, in order to receive restitution of amounts that **Zimmer**'s unlawful practices have wrongfully caused them to pay during the Class period.

32.      Plaintiff **Lola B. Thorpe** underwent knee replacement surgery in May 2005.  One or more **Zimmer** products were implanted or otherwise used in her surgery.  Although the surgery was covered by Medicare, Plaintiff paid a portion of the costs.  Based on available information, she estimates that her out-of-pocket expenses for the surgery amounted to several thousand dollars.

## CLASS ACTION ALLEGATIONS

33.      Plaintiff brings this action on her own behalf and as a class action pursuant to rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

> All individuals who are, or at the relevant time were, residents of New York who had hip or knee implant surgery during the Class period that involved the use of Zimmer products and who paid for all or a portion of the total costs of the surgery.

34.     Plaintiff does not know the exact number of Class members.  However, as discussed below, a conservative rough estimate indicates that the class numbers in the thousands. The exact number of such individuals may be determined through Defendants' records, and their identities may be derived from such records.  Thus, the Class is both numerous and ascertainable. Based on federal investigators' estimate that approximately 700,000 hip or knee implant surgeries are performed in the United States every year, and applying Census data indicating that approximately 6.5% of the total U.S. population now lives in New York, Plaintiff estimates that more than 45,000 hip or knee implant surgeries are performed on residents of New York State every year.  Assuming further, for purposes of estimating the order of magnitude of the class, that **Zimmer**'s self-reported market share of between 26% and 28% of sales of hip and knee implant products roughly reflects its share of such surgeries in New York State, more than 12,000 New York State residents are implanted with **Zimmer** hip or knee devices every year.  Finally, even if only the one third of these surgeries that, according to federal officials, are not covered by Medicare were included in the Class (a conservative assumption because, as Plaintiff's circumstances reflect, even patients whose surgeries are covered by Medicare may nonetheless pay a portion of the costs of the surgery), the resulting rough estimate would be that the Class includes more than 4,000 patients per year.  Thus, the Class amply satisfies the numerosity criterion under rule 23(a).

35.     There are questions of fact or law common to the Class, including without limitation the following:

a.     Whether the **Zimmer** Defendants, or any of them, engaged in an ongoing business practice during the Class period of providing payments or other consideration of monetary value to hip and/or knee surgeons in accordance with agreements reached between **Zimmer** and such surgeons through which **Zimmer** sought to induce such surgeons to choose its products in hip or knee implant surgery;

b.     Whether **Zimmer** sought to conceal such payments or consideration provided to hip and/or knee implant surgeons, or to disguise the actual basis of such payments or other consideration provided to such surgeons, and, if so, over what time period **Zimmer**

continued to engage in such practices;

    c.    Whether such agreements and the co-conspirators' conduct pursuant to them had the effect of inflating the price of **Zimmer** products used in hip and/or knee implant surgery, and, if so, by how much;

    d.    Whether such agreements and the co-conspirators' conduct pursuant to them violated New York law, including without limitation the anti-kickback statute (N.Y. Soc. Serv. Law § 366-d); the New York False Claims Act (N.Y. Finance Law §§ 187-194); and/or the deceptive practices statute (N.Y. Gen. Bus. Law § 349);

    e.    Whether such agreements and the co-conspirators' conduct pursuant to them violated federal law, including without limitation the federal Anti-Kickback Act (41 U.S.C. §§ 51 *et seq.*); the Medicare fraud statute (42 U.S.C. § 1320a-7b); 42 U.S.C. § 1395nn; and/or the federal False Claims Act (31 U.S.C. §§ 3720 *et seq.*);

    f.    Whether Plaintiff and members of the Class incurred increased health care costs as a result of the conduct of Defendants, and each of them; and

    g.    The appropriate measure of the overall damages sustained by Plaintiff and the Class.

    36.    Plaintiff is a member of the Class, and Plaintiff's claims are typical of the claims of the Class members, in that Plaintiff had knee replacement surgery during the Class period in which the surgeon inserted one or more **Zimmer** products.

    37.    Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff's interests are coincident with and not antagonistic to those of other members of the Class. Plaintiff is represented by counsel competent and experienced in the prosecution of consumer protection and class action litigation.

    38.    The questions of fact and/or law common to the members of the Class predominate over any questions affecting only individual members of the Class.

    39.    A class action is superior to other methods for the fair and efficient adjudication of this controversy.  Treatment as a class will permit a large number of similarly situated individuals to adjudicate their common claims in a single forum simultaneously, efficiently, and

without the duplication of effort and expense, and risk of inconsistent rulings or outcomes, that numerous individual actions would engender.

40.     Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate the claims asserted in this Complaint.

41.     This litigation presents no difficulties in management that would preclude maintenance as a class action.

<u>**TOLLING OF STATUTES OF LIMITATIONS**</u>
<u>**BY FRAUDULENT CONCEALMENT**</u>

42.     Throughout the relevant period, Defendants affirmatively, purposefully, and fraudulently concealed their unlawful conduct from Plaintiff and the Class.

43.     Plaintiff and the members of the Class did not discovery, and could not discover through the exercise of reasonable diligence, that Defendants were violating the anti-kickback and other laws as alleged herein until shortly before this litigation was commenced.  Plaintiff and members of the Class could not have discovered the violations earlier than that time because Defendants conducted their anti-competitive kickback conspiracy in secret, concealed the nature of their unlawful conduct and the acts in furtherance thereof, and fraudulently concealed their activities through various means and methods designed to avoid detection.  The conspiracy was by its nature self-concealing.

44.     Defendants engaged in a successful anti-competitive conspiracy, as herein alleged, which they affirmatively concealed, in at least the following respects:

(1)     By agreeing among themselves and with the unnamed co-conspirators not to discuss publicly, and not to otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

(2)     By engaging in secret meetings, telephone calls, and/or other communications in order to further their illicit scheme; and/or

(3)     By giving false and pretextual reasons for their actions and the consideration exchanged between Defendants and the unnamed co-conspirators during the

relevant period, providing false descriptions of the basis and reasons for any payments exchanged, other consideration provided, and/or decisions to use or recommend Defendants' devices in hip and/or knee implant surgeries.

45.     As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiff and the Class assert the tolling of any applicable statute of limitations affecting the rights of action of Plaintiff and the members of the Class.

**FIRST CAUSE OF ACTION**
**(VIOLATION OF DECEPTIVE PRACTICES STATUTE,**
**N.Y. GEN. BUS. LAW § 349)**

46.     Plaintiff realleges each of the foregoing allegations of this Complaint with the same force and effect as if fully set forth herein.

47.     As alleged above, the **Zimmer** Defendants, and each of them, have engaged in improper practices that were oriented to the consumer public, in that they were geared to covertly and artificially increasing **Zimmer's** market share and product prices (prices that are passed along, at least in part, to members of the Class and that also have tended to increase patient health insurance premiums and co-pay amounts over time) as well as to provide improper consideration to co-conspirator surgeons for choosing **Zimmer** hip or knee implant products.

48.     As alleged above, the **Zimmer** Defendants' kickback practices were misleading in a material respect in that the participating parties deliberately hid the nature of their agreements and practices from both responsible health care officials and the consuming public, the agreements were deliberately designed to disguise the improper nature of the compensation or other valuable consideration that **Zimmer** provided to certain hip and knee implant surgeons, and the agreements violated a number of state and federal laws.

49.     As alleged above, Plaintiff and other members of the Class were each injured as a result of the **Zimmer** Defendants' improper and deceptive practices when Plaintiff and other Class members paid out-of-pocket expenses, which were artificially and wrongfully inflated by virtue of **Zimmer's** practices, for their knee or hip implant surgery which involved **Zimmer** products.  Pursuant to New York's deceptive practices statute, N.Y. Gen. Bus. Law § 349(h), Plaintiff therefore seeks actual damages or fifty dollars, whichever is greater, from Defendants on

her own behalf and also actual damages or fifty dollars, whichever is greater, on behalf of each Class member, according to proof, along with reasonable attorneys' fees.  In addition, Plaintiff, on behalf of herself and the Class, seeks a permanent injunction prohibiting **Zimmer** from engaging in such improper practices in the future.

**SECOND CAUSE OF ACTION**
**(UNJUST ENRICHMENT)**

50.    Plaintiff realleges each of the foregoing allegations of this Complaint with the same force and effect as if fully set forth herein.

51.    As alleged above, the **Zimmer** Defendants have received financial benefits through their participation in the improper kickback scheme, in the form of artificially inflated demand and prices for their hip and knee implant products within the United States.

52.    As alleged above, such enrichment of the **Zimmer** Defendants was unjust, as between said Defendants, on the one side, and Plaintiff and other Class members, on the other side, because Defendants obtained such financial benefit through improper, illegal, and covert practices that unfairly increased the cost of hip or knee implant surgery to Plaintiff and the other members of the Class.

53.    Plaintiff therefore seeks restitution from Defendants on her own behalf and also on behalf of each Class member, according to proof.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and all members of the Class, prays for judgment and relief as follows:

a.    That the Court, pursuant to Rule 23 of the Federal Rules of Civil Procedure, certify the case as a class action on behalf of the proposed Class, designate Plaintiff as the representative of the Class, and designate Plaintiff's counsel of record as Class Counsel;

b.    That the Court adjudge and decree that the acts of the Defendants are unlawful and in violation of New York's deceptive practice statute, N.Y. Gen. Bus. Law § 349;

c.      That the Court adjudge and decree that Defendants have been unjustly enriched as against Plaintiff and the Class by virtue of their wrongful conduct;

d.      That the Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiff and the Class for damages and/or for restitution as allowed by law and according to proof;

e.      That the Court permanently enjoin and restrain each of the Defendants and their successors, assigns, parents, subsidiaries, affiliates, and transferees, and their respective officers, directors, agents, and employees, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, in any manner, directly or indirectly, from continuing, maintaining, or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein;

f      That the Court award Plaintiff and the Class attorneys' fees and costs, along with pre-judgment and post-judgment interest as permitted by law; and

g.      That the Court award Plaintiff and the Class such other and further relief as may be necessary and appropriate.

Date:  April 23, 2008                 Respectfully submitted,

**COTCHETT, PITRE & McCARTHY**

By: _____

Joseph W. Cotchett (JC-7420)
Steven N. Williams (SW-6198)
Stuart G. Gross (SG-4435)

**PARKER WAICHMAN ALONSO, LLP**

By: _____

Jerrold S. Parker (JP-6865)
Andres F. Alonso (AA-8307)
David B. Krangle (DK-8085)
111 Great Neck Road, 1st Floor
Great Neck, NY  11021-5402
Telephone:  (516) 466-6500

**Attorneys for Plaintiff and the Class**

## <u>DEMAND FOR JURY TRIAL</u>

On behalf of herself and the Class, Plaintiff hereby requests trial by jury as to all issues so triable.

_____
Joseph W. Cotchett (JC-7420)